OPINION
This is an appeal by defendant-appellant, Cesar O. Cosolis, from a judgment of sentence and conviction entered by the Franklin County Court of Common Pleas following a jury trial in which defendant was found guilty of gross sexual imposition, rape, attempted rape, and kidnapping.
On April 11, 2001, defendant was indicted on one count of aggravated burglary, in violation of R.C. 2911.11, one count of gross sexual imposition, in violation of R.C. 2907.05, three counts of rape, in violation of R.C. 2907.02, one count of attempted rape, in violation of R.C. 2923.02 and 2907.02, and one count of kidnapping, in violation of R.C. 2905.01.
The matter came for trial before a jury beginning August 6, 2001. The first witness for the state was Columbus Police Officer Jeff Vance. On March 21, 2001, Officer Vance was dispatched to an apartment at 4600 Northtowne Boulevard. The dispatch involved a "911 hang-up call." The dispatcher told the officers that when a call was placed back to the location, a male had answered the phone and hung up. When officers arrived, they knocked on the door and nobody answered. After knocking again, a female answered the door. She was crying, and stated that she had just been raped. The woman had blood around her mouth, and she stated that her attacker had just exited through a window. The officers looked around the apartment complex but could not find a suspect. The officers recovered underwear on the ground outside the apartment. The victim was transported to Riverside Methodist Hospital.
On March 21, 2001, Angela Wallen, the victim, resided at 4600 Northtowne Boulevard. Wallen has a five-year old daughter, Ashley. Wallen's boy-friend, Dagoberto Santiago, lived with her at the apartment during this time. Wallen gave the following testimony regarding the incident. On the morning of March 21, 2001, at approximately 5:00 a.m., Wallen was awakened when she heard "someone messing with my bedroom door, * * * like they had keys or something." (Tr. 146.) At first, she thought it was her boyfriend. She eventually realized it was someone she had met previously at the home of her boyfriend's sister; on that occasion, this individual had asked Wallen's boyfriend for help in getting his vehicle out of an impoundment lot.
Wallen identified defendant at trial as the man who entered her apartment that morning. Wallen told him in Spanish to "Get the hell out." (Tr. 151.) Defendant then hit her in the face three times. Wallen's daughter was in the bedroom at the time and she woke up. Wallen testified that "[h]e laid me down and started touching me, and he took off my panties and had sex with me." (Tr. 152.) During this time, Wallen was telling him "No. Stop." (Tr. 152.) Wallen "cooperated" because she was afraid "he would want to do something with my daughter." (Tr. 153.) During this time, Ashley became scared and ran out into the living room. Defendant went into the living room to get Wallen's daughter, and Wallen dialed 911 and hung up. At some time later during the incident, the phone rang and defendant answered it and placed the receiver on the floor.
Defendant carried Ashley back into the room and laid her on the floor. He then "continued to have sex" with Wallen. Defendant then wanted Wallen to perform fellatio, and she told him "no." (Tr. 155.) Defendant got back on top of Wallen and put his hands and mouth on her breasts. Defendant then put his mouth in her vaginal area. Wallen continued to ask him to stop and "he got mad and struck me in the face for it." (Tr. 157.) Defendant kept telling her to shut up, and he hit her again because she would not kiss him. Defendant eventually ejaculated inside of her; he then put his clothes on and said "[t]hank you." (Tr. 159.) During the incident, defendant kept asking Wallen how much money she wanted. After he put his clothes on, defendant placed a $5 bill on the bed.
Defendant then went into the living room to leave, but just at that time police officers knocked on the door. After the officers knocked on the door a second time, defendant went into the bedroom and asked Wallen to open the window for him. Wallen was afraid that if she did not comply he might do something with her daughter. Wallen opened the window and defendant "dove through the window and knocked the screen out." (Tr. 162.) Wallen then opened the apartment door and told the officers she had just been raped. The officers looked for the suspect but could not find anyone in the vicinity. The officers then transported Wallen to the hospital.
Wallen later accompanied a detective to defendant's apartment and Wallen identified him as her assailant. Wallen was "[o]ne-hundred percent positive" regarding her identification. (Tr. 173.)
During cross-examination, Wallen stated that an individual named Jorge Morales leased the apartment where she was living. She acknowledged that her boyfriend was in this country illegally and that, on the date of the incident, he did not come home from work at his normal time. During redirect examination, Wallen stated that Morales had asked her boyfriend to move into his apartment because the rent was too much for him to pay alone. Wallen denied that she had ever accepted money for sex.
Wallen's boyfriend, Dagoberto Santiago, testified that he was in the country illegally. Santiago and defendant had worked together at Jeepers Restaurant. Defendant's vehicle was impounded at one time, and Wallen made a telephone call on defendant's behalf.
On March 21, 2001, Santiago was residing at 4600 Northtowne Boulevard Apartments with Wallen, her daughter, and an individual named Jorge. There was only one bedroom in the apartment, and Santiago and Wallen had use of the bedroom. Santiago paid part of the rent. On the date of the incident, Santiago was working at the Shark Club. Defendant stopped by that evening, offering to give Santiago a ride. They left Santiago's workplace that evening and went to a bar for one and one-half hours. Later, they went to a party near Cleveland Avenue where they drank beer. After they left the party, defendant parked the vehicle on Cleveland Avenue and told Santiago he was drunk. Defendant "said he couldn't drive, and I just waited for the morning. I went asleep." (Tr. 226.) Santiago fell asleep in the front passenger seat.
When he awoke, sometime between 6:00 and 7:00 a.m., defendant was gone. Santiago discovered that he did not have his keys or his wallet. Santiago then left the vehicle and took a bus to the residence of a cousin in Westerville. Santiago attempted to call Wallen to inform her that he was going to help his cousin with a job application, but nobody answered the phone. After helping his cousin, he returned to his apartment and found a "mess" in the house, with clothes scattered and "blood [on] one of the pillows." (Tr. 229.)
Santiago denied ever receiving money from defendant so that defendant could have sex with Wallen. Santiago stated that his keys and wallet were never returned.
Columbus Police Detective Andrew Mitchell works in the sexual abuse squad of the detective bureau, and he investigated the incident at Northtowne Boulevard. Detective Mitchell went to Riverside Methodist Hospital to speak with the victim on the date of the incident. At the time, Wallen was "very upset, very emotional, crying, hard to understand." (Tr. 248.) Detective Mitchell noticed dried blood around her mouth. Detective Mitchell conducted an interview with her at the time. Wallen's boyfriend provided the detectives with the name of a suspect.
On April 1, 2001, police officers located defendant at an address on Shanley Drive. Detective Mitchell went to the residence accompanied by Wallen, and Wallen identified defendant as her assailant. Defendant was then placed under arrest.
Detective Mitchell conducted an interview with defendant. Defendant told the detective that he and Santiago were friends, and that on the date of the incident he gave Santiago a ride to a party. They drank beer during the party, and defendant indicated to Santiago that he wanted to have sex with Santiago's girlfriend. Defendant stated that Santiago gave him the keys to his apartment, and "Santiago received $20 so he could go have sex with Angela." (Tr. 254.) Defendant told the detective he took a friend's car instead of his own car to the apartment at Northtowne Boulevard. He did not explain why he did not take his own car. Defendant stated that he entered the apartment with a key and went directly to the bedroom, which was unlocked. He approached Wallen while she was asleep in her bed. Defendant told Wallen, "`Santiago sent me over here. It's okay. He paid me' or, `I paid him money to have sex with you,' and he said that she agreed." (Tr. 255.)
The detective asked defendant why he ran when he heard a knock on the door. Defendant told the detective "he thought Santiago had second thoughts and was coming back to beat him up." (Tr. 255.) When asked why his underwear was left behind, defendant "said he accidentally put on Angela's underwear instead of his own and that's why he left his." (Tr. 255.) Defendant denied hitting Wallen or causing any injuries to her. Defendant also told the detective "he tipped her $5 when he left." (Tr. 256.) Detective Mitchell noted that a $5 bill was found on the bed comforter. Defendant did not say that he was aware Wallen had dialed 911, and defendant indicated that when the phone rang he did not know it was the police calling back, so he just hung up the phone.
During cross-examination, Detective Mitchell indicated that he interviewed Wallen on two occasions, March 21, 2001 and April 11, 2001. During the interview on March 21, 2001, Wallen indicated that she called 911 before any sexual conduct occurred, and that defendant took Ashley from the bedroom to the living room prior to any conduct.
During redirect, Detective Mitchell stated that during the second interview with Wallen she was in a better emotional state than during the first interview; the second interview was "more complete," and Wallen gave more details regarding the incident. (Tr. 266.)
Defendant testified on his own behalf. The defendant is 21 years of age, and he was born in Mexico. Defendant "paid money" to come to Columbus to work. He lived with his brother on Shanley Court.
Defendant and Santiago worked together for a brief period of time. Defendant testified that Wallen at one time "moved to my house." (Tr. 278.) He stated that Wallen "only stayed for two nights, and she would only arrive to take a shower, and she would leave. She stayed there 15 days." (Tr. 279.) Defendant stated that "while she was staying at my house, I had relations with her, and I paid [Santiago] once for that. And the second time, I paid her for that." (Tr. 279.) According to defendant, Santiago "told me that she was a prostitute and that she gave sexual services." (Tr. 280.) Defendant also testified that Wallen once left a home "through a window because she did not want to pay rent to some Mexicans." (Tr. 278.)
Defendant gave the following account regarding the events of March 21, 2001. On that date, defendant picked up Santiago at work at Santiago's request. They went to a bar on High Street and Morse Road and remained there for approximately one hour. At the bar, defendant told Santiago that he wanted to have sex with Wallen. Santiago called Wallen from the bar, and Santiago then told defendant "not yet, because the owner of the home was still there, but he was going to go out later." (Tr. 285.) They subsequently went to an apartment complex near Cleveland Avenue and Route I-270, and drank more beer for approximately one hour. According to defendant, Santiago remained at the apartment for the night. Santiago called Wallen again on the phone and "he told her that I would be going. I paid him, and they had already been in contact with each other." (Tr. 285-286.)
Santiago gave defendant his keys and defendant went to Wallen's apartment. According to defendant, "I arrived, and I opened the door, and she already knew, so she was waiting for me. * * * I gave her the keys because he told me when I arrived to give her the keys * * * and she already knew what to do." (Tr. 287.) Defendant testified that "she took her clothes off, and I took my clothes off." (Tr. 288.) Defendant denied ever touching Wallen's child. Wallen told defendant the child was in the living room. Defendant stated that he had consensual sex with Wallen, and he denied ever hitting her. He indicated "she wanted to fight because she wanted more money." (Tr. 289.) Wallen "wanted $20, and all I had was $5, but I couldn't explain to her that I had already paid him. I had imagined that they had already been in contact and communicated." (Tr. 290.)
Defendant wanted to leave the apartment but "[s]he got in front of the door." (Tr. 291.) When asked about how he left the apartment, defendant testified as follows:
 I left. I am not sure, because I had already been drinking a little bit, but somebody was trying to come into the apartment, and that's why I didn't tell her anything. She opened the window, then she got her underwear, she gave it to me, and because I was in a hurry to get out, I didn't realize whether it was mine or hers, and I took hers with me. (Tr. 291.)
Defendant stated that after he left the apartment he "went walking to my car." (Tr. 291.) He stated that there "wasn't any" police car at the apartments. (Tr. 291.) Defendant then went to his home.
During cross-examination, defendant stated that he had been in Columbus since August 2000, and he acknowledged that he was in the country illegally. Defendant stated that on the night of the incident he went to the Northtowne Boulevard Apartments in somebody else's car because he was "afraid that the police would get me in my car since one of the lights wasn't working." (Tr. 299.) He acknowledged that he had driven his own car earlier that evening after dark. Defendant claimed that he took keys to the apartment because he was "worried that the owner of the home * * * would be there." (Tr. 302.)
Defendant stated that he was unaware that Wallen dialed 911. When asked how Wallen could have received injuries to her face, defendant stated, "when I was leaving, somebody I heard some knocking on the door, but it could have been the owner of the house, and I was afraid he was going to find me in the house and that he was going to throw her out for prostituting in his apartment." (Tr. 303.) Defendant also stated that he thought it was Santiago at the door.
Following the presentation of evidence, the jury returned verdicts finding defendant guilty of the counts charging him with rape, attempted rape, gross sexual imposition and kidnapping; the jury found defendant not guilty of aggravated burglary. The trial court conducted a sentencing hearing on August 14, 2001, and the court sentenced defendant by entry filed August 16, 2001.
On appeal, defendant sets forth the following five assignments of error for review:
Assignment of Error One
 THE COURT ABUSED ITS DISCRETION BY IMPOSING THE MAXIMUM SENTENCE FOR KIDNAPPING WITHOUT MAKING THE NECESSARY FINDING THAT THE DEFENDANT COMMITTED THE WORST FORM OF THE OFFENSE, OR THAT THE DEFENDANT POSED THE GREATEST LIKELIHOOD OF COMMITTING FUTURE CRIMES.
Assignment of Error Two
 APPELLANT'S CONVICTION WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.
Assignment of Error Three
 APPELLANT WAS DENIED HIS RIGHT TO A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT.
Assignment of Error Four
 THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AS IS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.
Assignment of Error Five
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY FAILING TO MAKE THE WRITTEN JURY INSTRUCTIONS PROVIDED TO THE JURY A PERMANENT PART OF THE RECORD FOR USE ON APPEAL.
Under his first assignment of error, defendant asserts that the trial court erred by imposing the maximum allowable sentence without making requisite findings pursuant to R.C. 2929.14(C).
R.C. 2929.14(C) provides in part that a court imposing a sentence upon an offender for a felony "may impose the longest prison term authorized for the offense * * * only upon offenders who committed the worst forms of the offense, upon offenders who pose the greatest likelihood of committing future crimes, upon certain major drug offenders * * * and upon certain repeat violent offenders." Defendant contends in the instant case that the trial court imposed the maximum sentence in this case without making the required finding that he committed the worst form of the offense or that he posed the greatest likelihood of committing future crimes.
In State v. Hill (Sept. 26, 2000), Franklin App. No. 99AP-1342, this court discussed the requirements necessary for a trial court to impose the maximum sentences as follows:
 The Supreme Court in State v. Edmondson (1999), 86 Ohio St.3d 324 acknowledged a public policy disfavoring maximum sentences except for the most deserving offender, stating:
 "[T]he court imposing a sentence upon an offender for a felony may impose the longest prison term authorized for the offense * * * only upon offenders who committed the worst forms of the offense, upon offenders who pose the greatest likelihood of committing future crimes, upon certain major drug offenders * * * and upon certain repeat violent offenders * * *." (Emphasis sic.) Id. at 328.
 Under R.C. 2929.14(C), "the record must reflect that the trial court imposed the maximum sentence based on the offender satisfying one of the listed criteria in R.C. 2929.14(C)." Id. at 329.
 While R.C. 2929.14(C) itself does not require that the trial court state its reasons for imposing the maximum sentence, R.C. 2929.19(B)(2)(d) does. State v. Moss (Dec. 28, 1999), Franklin App. No. 99AP-30, unreported. Thus, the trial court is not only required to make the requisite findings under R.C. 2929.14(C), but also to state its reasons, as required under R.C. 2929.19(B)(2)(d). State v. Legg (Mar. 7, 2000), Franklin App. No. 99AP-574, unreported.
At the sentencing hearing, the trial court made the following statements on the record:
 This is the first incarceration in a prison institution for the Defendant. I think it goes without saying, however, the statute requires that I make the necessary findings and that obviously a minimal prison term for this type of offense would demean the seriousness of the offense.
 The Court is going to impose a sentence on Count Three of the indictment, Count Four and Count Five of the indictment of nine years.
 The Court is going to impose a sentence of 10 years on Count Seven, the kidnapping count.
 I will order that Counts Three, Four and Five be served concurrent to each other and Count Seven consecutive to those counts.
 The reason for imposing the consecutive sentence is that I believe it is necessary to protect the public, that it is certainly not disproportionate to the seriousness of the offense.
 Again, there are two separate and distinct offenses here; one, having the child being taken from one room to another room, the other of committing the rape. The Court believes that no single term would adequately reflect the seriousness of those two offenses. [Tr. 385.]
Upon review of the sentencing hearing, while the trial court made a finding that a minimum sentence would demean the seriousness of the offense, and the court stated reasons for consecutive sentences, we agree with defendant's contention that the trial court failed to indicate either that defendant committed one of the worst forms of the offense or posed the greatest likelihood of committing future crimes. Furthermore, a review of the sentencing entry also fails to indicate any such findings by the trial court. Because it is not clear from the record that the trial court made the requisite findings, we vacate defendant's sentence and remand this matter to the trial court for resentencing. See State v. Ratliff (Nov. 30, 2000), Cuyahoga App. No. 77810 (sentence vacated and remanded for resentencing; while trial court found that a minimum sentence would demean the seriousness of the offense, there is no evidence that the court determined appellant committed the worst form of the offense or posed the greatest likelihood of committing future crimes).
Accordingly, defendant's first assignment of error is sustained.
Under his second assignment of error, defendant contends that his conviction was against the manifest weight of the evidence. More specifically, defendant contends that the evidence weighs heavily against conviction because of purported inconsistencies in the victim's testimony between her first interview with Detective Mitchell, taken on the date of the incident, and her second interview given weeks later.
In determining whether a criminal conviction is against the manifest weight of the evidence, this court "must examine the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of the witnesses to determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created a manifest miscarriage of justice." State v. Guddy, Cuyahoga App. No. 80390, 2002-Ohio-3102, at ¶ 26. Further, a reviewing court "should grant a new trial only in an exceptional case in which the evidence weighs heavily against the conviction." Id. Finally, "[b]ecause the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact." Id.
In the present case, although Wallen may have provided differing accounts to the detective in the two interviews, the jury heard the witness provide an explanation of her inconsistent statements. Wallen explained during redirect examination that, at the time she spoke with the detective at the hospital shortly after the incident, she was "disturbed" and "upset," and she was uncomfortable having to describe the details of the incident to the detective. (Tr. 202.) After Wallen had a chance to read a report regarding what she had related to the detective during that first interview, she found "some things on there that I didn't even know that I said, I mean, because I knew what happened." (Tr. 202.) Wallen wanted to meet with the detective again, and she told him that "[s]ome of the things I said, I was confused," and "I wanted to correct it." (Tr. 202.) Wallen wanted the summary to reflect that defendant did not take her daughter out of the room; rather, she ran out of the room and defendant went in the other room to get her. Wallen testified that she remembered "everything that happened," but that she had difficulty remembering the exact order of events that night. She further stated that during the second interview with the detective she "could think more clearly." (Tr. 203.)
Detective Mitchell corroborated that at the time of the first interview the victim was "very upset, very emotional, crying, hard to understand." (Tr. 248.) He stated that during the second interview she was "more calm and more collected." (Tr. 266.) According to Detective Mitchell, Wallen's accounts in the two interviews "were consistent," and that during the second interview she provided "a lot more details of what really happened and certain acts that were performed." Id.
Upon review, we do not find that the jury clearly lost its way and created a manifest miscarriage of justice in reaching its verdict. To the extent Wallen gave inconsistent statements to the detective in the interviews, her credibility was for determination by the trier of fact. As noted, the jury heard Wallen's explanation for the inconsistencies, and the jury could have reasonably accepted her testimony that she was upset, disturbed and uncomfortable when talking with the detective at the hospital. See, e.g., State v. Woods (Mar. 24, 1995), Portage App. No. 93-P-0081 (although witness gave different accounts of the incident initially, the evidence indicated that witness was both frightened and embarrassed at the time, and jury was free to believe witness' explanation of inconsistent statements). One appellate court has reasoned that, "[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility." State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288. In the present case, the evidence presented by the state, if believed, was sufficient for a rational jury to find defendant guilty of the charged offenses beyond a reasonable doubt, and we decline to substitute our judgment for that of the jury.
Based upon the foregoing, defendant's second assignment of error is without merit and is overruled.
Under the third assignment of error, defendant contends that he was denied his right to a fair trial due to prosecutorial misconduct. More specifically, defendant cites several instances of alleged prosecutorial misconduct at trial during the prosecutor's questioning of the victim, Wallen, and Detective Mitchell. Defendant first cites the following exchange between the prosecutor and Wallen during direct examination:
 Q. At some point, did he try to force you to do something else?
* * *
A. Yes. [Tr. 155.]
Later, after Wallen testified that defendant had put his hands and mouth on her breasts, the prosecutor asked, "[w]hat did he do after that?" (Tr. 156.) Wallen responded, "I don't remember exactly. I remember what happened but not in order. He went down on me." (Tr. 157.)
Wallen later testified that, during the incident, defendant wanted her to perform fellatio, but she talked him out of having to engage in that act. The prosecutor then asked, "[a]fter you refused that, what happened? What did he do?" (Tr. 158.) Wallen responded, "[h]e got back on top, and then he finished." (Tr. 158.)
Defendant also cites the following exchange between the prosecutor and Detective Mitchell during redirect examination:
 Q. Detective, in the first interview, did she indicate to you that the Defendant attempted to force her to perform fellatio on the * * * Defendant?
A. Yes.
* * *
 Q. So there were multiple sexual acts indicated in that interview, correct?
A. Yes. [Tr. 267.]
In State v. Owens (Feb. 25, 2000), Montgomery App. No. 17394, the court noted that:
 * * * In considering claims of prosecutorial misconduct, an appellate court must examine whether the prosecutor's conduct at trial was improper, and if so, whether this conduct affected the defendant's substantial rights. * * * The analysis centers on the fairness of the trial, not the culpability of the prosecutor, in determining whether the prosecutor's conduct is grounds for error. * * * Error exists if it is clear beyond a reasonable doubt that the jury would not have found the accused guilty absent the prosecutor's comments. * * *
We note that in the alleged instances of misconduct cited by defendant, defense counsel did not object to the questions posed by the prosecutor. It has been held that "[w]here defense counsel fails to object to the prosecutor's remarks during trial, unless the remarks constitute plain error, a reviewing court need not consider whether these remarks prejudiced the defendant." State v. Elkins (Sept. 27, 2000), Summit App. No. 19684. Further, "[p]lain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise." Id.
Regarding the questions by the prosecutor asking the witness "what did he do next," or "what happened," we agree with the state's contention that these are nonleading questions. Specifically, "[l]eading questions involve the questioner in-structing the witness how to answer or putting words into the witness' mouth to be echoed back." State v. Jordan (Dec. 19, 2000), Franklin App. No. 00AP-414. Questions such as "what happened," or "what did he do next" have been held to be "neutral in substantive content." State v. Pearson (June 27, 2000), 617 N.W.2d 677, unpublished disposition. While the other question at issue posed to this witness asked whether defendant forced her to do anything else, the question did not suggest the answer, and thus we would also conclude that it was nonleading. Accordingly, we find no merit to defendant's contention that the prosecutor engaged in misconduct during the questioning of Wallen.
Concerning the prosecutor's questions to the detective, the state acknowledges that they were leading, but the state argues that they occurred during redirect, and defense counsel had already elicited the same testimony earlier on cross-examination. The state further argues that the detective's testimony merely corroborated the victim's testimony that there were multiple sex acts, and thus there was sufficient evidence on this issue without his testimony. We agree. A review of the record indicates that the detective had previously indicated, during cross-examination, "there was more than one act." (Tr. 262.) Thus, although the questions may have been leading, where the detective had already given similar testimony during cross-examination, we find no prejudice to defendant, and he has failed to demonstrate plain error affecting his substantial rights.
Based upon the foregoing, defendant's third assignment of error is without merit and is overruled.
Under his fourth assignment of error, defendant asserts that he was denied effective assistance of counsel because his counsel did not object to the alleged prosecutorial misconduct raised under his third assignment of error.
In State v. Brooks (1986), 25 Ohio St.3d 144, 147, the Ohio Supreme Court noted that, in order to bring a successful claim of ineffective assistance of counsel, a defendant must satisfy the two-part test set forth in Strickland v. Washington (1984), 466 U.S. 668. Under this test, defendant must first "`show that counsel's performance was deficient. * * * Second, the defendant must show that the deficient performance prejudiced the defense. * * * Unless a defendant makes both showings, it cannot be said that the conviction * * * resulted from a breakdown in the adversary process that renders the result unreliable.'" Brooks, supra, at 147, quoting Strickland, supra, at 687.
In addressing defendant's third assignment of error, we rejected defendant's contention that the prosecutor engaged in misconduct by questioning the victim, Wallen, in a leading manner. We also found that defendant was not prejudiced as a result of questions posed to Detective Mitchell during redirect examination. Having previously found no prejudice to defendant as a result of the alleged prosecutorial misconduct, we cannot conclude that defense counsel's representation, regarding the failure to object to the questions at issue, prejudiced defendant. Accordingly, because defendant cannot satisfy the second prong of Strickland, we need not address the first prong of that test.
Defendant's fourth assignment of error is without merit and is overruled.
Under the fifth assignment of error, defendant asserts that the trial court committed prejudicial error by failing to make the written jury instructions provided to the jury a permanent part of the record on appeal. Defendant argues that, while it is apparent that written instructions were provided to the jury, because the jury referenced the written instructions in notes to the trial court during deliberations, the transcript of the trial does not affirmatively indicate that the written instructions given to the jury are identical to the charge given orally to the jury. Defendant cites R.C. 2945.10(G) for the proposition that written jury instructions should be preserved as part of the record, and defendant contends that in the instant case the instructions cannot be reviewed to determine whether or not they were the same as the charge given orally to the jury.
The record in this case indicates that, subsequent to the filing of defendant's brief with this court, the state filed a motion with the trial court to correct or modify the record to reflect the written jury instructions provided to the jury. On March 7, 2002, the trial court granted the state's motion to correct or modify the record. On March 8, 2002, the state filed with this court a motion to supplement the record on appeal with the written jury instructions. By entry filed March 11, 2002, this court granted the state's motion.
R.C. 2945.10(G) states in part that "[w]ritten charges and instructions shall be taken by the jury in their retirement and returned with their verdict into court and remain on file with the papers of the case." It has been noted that "[c]ompliance with this statutory requirement allows the reviewing court to determine whether reversible error occurred, although the failure to keep the written charge on file with the papers of the case may be harmless error." State v. Mills (Dec. 9, 1999), Cuyahoga App. No. 74700.
In State v. Henness (Feb. 6, 1996), Franklin App. No. 94APA02-240, this court held that a defendant's rights were not prejudiced by the omission of the written instructions where the transcript of proceedings included the oral recitation of the instructions and there was no indication in the record that the oral recitation deviated materially from the written instructions actually submitted to the jury. In State v. Scott (June 14, 1994), Franklin App. No. 93APA12-1752, this court held that where the transcript of the trial affirmatively indicated that the set of written instructions provided to the jury was identical to the charge given orally to the jury, any error by the trial court in failing to assure that the written instructions were maintained for inclusion in the record was not prejudicial.
In the present case, a review of the jury instructions supplemented with the record on appeal does not indicate that those instructions deviated from the instructions given orally to the jury. In the absence of evidence to the contrary, we presume regularity in the proceedings below and we find that defendant has not demonstrated prejudice by the trial court's failure to include written jury instructions with the record.
Defendant's fifth assignment of error is not well taken and is overruled.
Based upon the foregoing, defendant's first assignment of error is sustained, defendant's second, third, fourth and fifth assignments of error are overruled, the judgment of the trial court is affirmed in part, reversed in part, defendant's sentence is vacated and this cause is remanded to the Franklin County Court of Common Pleas for resentencing in accordance with law and consistent with this opinion.
Judgment affirmed in part and reversed in part; sentence vacated and cause remanded for resentencing.
TYACK, P.J., and BRYANT, J., concur.